FILED IN MY OFFICE
DISTRICT COURT CLERK
8/2/2016 3:02:48 PM
STEPHEN T. PACHECO
Maureen Naranjo

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

THOMAS J. SWIECH,

   **Plaintiff,**

v.            **Cause No.**  D-101-CV-2016-01854
             Case assigned to Thomson, David K.

FRED LOYA INSURANCE COMPANY,

   **Defendant.**

## COMPLAINT FOR INSURANCE BAD FAITH, BREACH OF CONTRACT AND UNFAIR TRADE PRACTICES

**COMES NOW**, Plaintiff, Thomas J. Swiech, by and through his counsel of record, **CARTER & VALLE LAW FIRM, PC** (Matthew J. Zamora, Esq. and Richard J. Valle, Esq.), and for his Complaint against Defendant Fred Loya Insurance Company, hereby states as follows:

1. Plaintiff is Thomas J. Swiech. an individual who resides in Bernalillo County, Albuquerque, New Mexico.

2. Defendant is Fred Loya Insurance Company (hereinafter "Loya").

3. Defendant Loya is a foreign corporation and is authorized to transact business in the State of New Mexico and may be served with process by delivery of summons and a true and accurate copy of this Complaint to the Office of Superintendent of Insurance, P.O. Box 1689, Santa Fe, NM 87504-1689.

4. This Court has jurisdiction of the parties and subject matter herein.

5. On June 21, 2013, Albuquerque Police Department Officers Barnard and Martin responded to the Mission Hills Apartments following a shoplifting call. *Exhibit 1*, Deposition of Officer Barnard, page 8: lines 1-19.



6.      On June 21, 2013, an uninsured motorist, named Brandon Sandoval, intentionally fled from police at a high rate of speed through an apartment complex parking lot and crashed into Plaintiff's vehicle.

7.      Police Officer Barnard witnessed the incident and testified at trial and deposition regarding what he saw.

8.      The officers arrived to the apartment complex and located the subject vehicle. *Id.* at 8:20-24.

9.      The subject vehicle was a Chevrolet Camaro, a sports car. *Id.* at 14:7-12.

10.     The officers then located the male subject, identified as Brandon Sandoval, who was walking near the vehicle. *Id.* at 9:4-10.

11.     Brandon Sandoval fled on foot when Officer Barnard attempted to make contact. *Id.* at 9:11-23.

12.     Officer Barnard immediately realized that Brandon Sandoval was intentionally trying to evade him. *Id.* at 16:11-13.

13.     Brandon Sandoval reached the Camaro and used it to flee.  *Id.* at 10:2-5.

14.     Officer Barnard heard a very loud engine coming around the corner. *Id.* at 10:6-7.

15.     Officer Barnard witnessed Brandon Sandoval driving "extremely reckless and at a high rate of speed." *Id.* at 10:8-9.

16.     Brandon Sandoval was driving so fast that he was losing traction as he came around the corner. *Id.* at 17:17-21.

17.     Brandon Sandoval was driving so fast that he did not have control of the vehicle. *Id.* at 18:11-13.

18.     Brandon Sandoval appeared to be driving at least 50 miles per hour, if not more, in the apartment complex parking lot, close to where people live. *Id.* at 17:21-25, 18:1-5.

19.    Officer Barnard and Officer Witten had to back up because they were concerned that Brandon Sandoval could possibly hit them with the vehicle. *Id*. at 10:9-11.

20.    Officer Barnard felt that he could be killed if he did not get out of the way of the vehicle. *Id*. at 18:16-20.

21.    Brandon Sandoval passed the officers but then slammed into Plaintiff's parked Chevrolet Suburban. *Id*. at 19:7-21.

22.    Brandon Sandoval hit Plaintiff's vehicle with such great force that he pushed Plaintiff's vehicle into another parked vehicle. *Id*. at 24:12-14.

23.    Brandon Sandoval caused property damage to Plaintiff's vehicle. *Id*. at 24:7-14.

24.    The collision did not stop Brandon Sandoval's attempt to flee.  Even though the Camaro was disabled, Brandon Sandoval presented himself as a threat to officers by not following commands. *Id*. at 21:9-16.

25.    Officer Barnard was concerned for his safety because he had information that Brandon Sandoval had a knife. *Id*. at 21:17-25, 22:1-4.

26.    Brandon Sandoval pulled the knife when officers attempted to arrest him, which was very concerning to the officers. *Id*. at 22:5-21.

27.    Fortunately, the officers were not injured and Brandon Sandoval was finally arrested for several felonies. *Id*. at 39:11-13.

28.    "[Brandon Sandoval's] conduct was extremely negligent, reckless, and violent." *Id*. at 39:11-13. His conduct was also "extremely dangerous." *Id*. at 18:6-10.

29.    Brandon Sandoval "showed a clear disregard for other people's property and other people's well-being by the way he was maneuvering that vehicle, and his disregard for anybody else that was at that complex." *Id*. at 26:7-10.

30.     The collision was completely caused by Brandon Sandoval, an uninsured driver. *Exhibit 2*, Deposition of Fred Loya's 30(b)(6) representative, Adriane Sealey, 34:12-23.

31.     At all times material hereto, Plaintiff was insured by Defendant Loya.

32.     The Loya insurance policy provided coverage in the amount of $25,000.00 per person, $50,000.00 per occurrence, and $10,000.00 for property damage.

33.     Plaintiff contracted and paid Defendant Loya for uninsured motorist coverage.

34.     Plaintiff had no ability to dictate or otherwise draft any of the policy provisions.

35.     Defendant Loya drafted the subject policy.

36.     The Loya policy is a contract of adhesion.

37.     Plaintiff made a claim with Defendant Loya for vehicle property damage and punitive damages based on the damage to Plaintiff's vehicle.

38.     Defendant Loya paid $3,566.24 for the property damage.

39.     Defendant Loya did not pay any amount for punitive damages.

40.     Plaintiff demanded punitive damages.

41.     Defendant Loya refused to pay punitive damages.

42.     Defendant Loya sued Plaintiff.

43.     The trial court issued a Scheduling Order requiring the parties to mediate their claims.

44.     Loya did not attend the mediation in good faith.

45.     Loya made a single settlement offer at the mediation with a pre-drafted letter.

46.     At trial, the Court heard evidence and made the following findings:

    a.  Brandon Sandoval's conduct was willful, wanton, malicious, reckless and oppressive.

    b.  Brandon Sandoval was entirely responsible for the damages to Plaintiff's vehicle.

    c.  Brandon Sandoval's conduct justifies a punitive damages award.

   d. Defendant Loya acted unreasonably in Plaintiff's first party claim.

   e. Defendant Loya breached its duty of good faith and fair dealing to Plaintiff.

47. Defendant Loya acted in bad faith.

48. Plaintiff was damaged by Defendant Loya's bad faith.

49. Plaintiff had an insurance contract with Defendant Loya for coverage under automobile policy no. 62-520939352.

50. Plaintiff complied with all contractual requirements in making his claim for insurance benefits.

51. Defendant Loya has duties to fairly investigate, handle, and settle claims that are submitted by its insureds. *Id.* at 21:12-24.

52. Defendant Loya's duty to its insureds is to handle their claims fairly and pay the claims that it owes. *Id.* at 21:25, 22:1-4.

53. Once Defendant Loya determines the damages that it owes, it must pay it. *Id.* at 35:6-9; 25:15; 30:21-25, 31:1.

54. If Defendant Loya says to its insured that it is going to do something, Defendant Loya must do it. *Id.* at 23:13-17; 24:5-8.

55. Defendant Loya must tell the truth, be honest, prompt, and fair. *Id.* at 23:18-25, 26:1.

56. Defendant Loya cannot lie, misrepresent, cheat, trick, or promise and not deliver. *Id.* at 24:13-25.

57. Defendant Loya agreed that Brandon Sandoval intentionally fled from the police. *Id.* at 51:8-25, 52:1-8.

58. Defendant Loya agreed that Brandon Sandoval's conduct was done with utter indifference to the consequences. *Id.* at 52:17-22.

59.     Defendant Loya agreed that Brandon Sandoval's conduct created a high risk of danger. *Id.* at 52:23-25, 53:1.

60.     Defendant Loya agreed that Brandon Sandoval's conduct was done with the indifference of the rights of Plaintiff. *Id.* at 53:2-10.

61.     Defendant Loya agreed that Brandon Sandoval exhibited a conscious disregard for the rights of Plaintiff. *Id.* at 53:11-19.

62.     Defendant Loya agreed that Brandon Sandoval's conduct should be punished. *Id.* at 55:8-11.

63.     Defendant Loya agreed that Brandon Sandoval's conduct should be deterred. *Id.* at 55:12-13.

64.     In fact, Defendant Loya has paid punitive damages in other cases for fleeing from police. *Id.* at 55:14-16.

65.     Despite the admissions by Defendant Loya in paragraphs 50 through 64 herein, Defendant Loya disputed that punitive damages were warranted to Plaintiff for Brandon Sandoval's conduct. *Exhibit 3*, Request No. 11.

66.     Plaintiff incurred at least $3,566.24 in physical property damage.

67.     Defendant Loya paid the undisputed remaining UM/PD limit in the amount of $6,433.76.

68.     Defendant Loya did not pay the aforementioned amounts for punitive damages. *Id.*, Request Nos. 15 and 16.

69.     Defendant Loya agreed that if punitive damages were awarded to Plaintiff, Defendant Loya would not be entitled to a credit because it did not pay for punitive damages. *Exhibit 2* at 48:25, 49:1-4.

70.     Defendant Loya sued Plaintiff in an attempt to reduce Plaintiff's claim for punitive damages.

71.     Defendant Loya forced litigation and trial against Plaintiff.

72.     The Loya policy and declarations page do not address the policy limit for payment of amounts for punitive damages. *See* Partial Summary Judgment, ¶ 8.

73.     Defendant Loya did not explain where the policy language clearly and unambiguously limited punitive damages stemming from a property damage claim to $10,000.00. *Id.* at ¶ 11 and 14.

74.     The Loya Insurance policy fails to clearly limit the amount of a punitive damages award. *Id.* at ¶ 9.

75.     The Loya policy does not limit the recovery of punitive damages based on property damage to the $10,000.00 property policy limit. *Id.* at ¶ B.

76.     The parties went to trial on October 5, 2015 before the Honorable Victor S. Lopez.

77.     The Court entered its judgment that Fred Loya Insurance Company shall forthwith pay Swiech the amount of $20,000 in punitive damages over and above the $10,000 amount previously paid for such property damage-based compensatory damages, together with costs and such other further relief as may be warranted under the policy or law.

78.     Defendant Loya attempted to frustrate and undermine the law of punitive damages by attempting to narrowly read the UIM coverage limits to minimize recovery. *See* Findings of Fact and Conclusions of Law; Judgment, ¶ G.

79.     Plaintiff beat Defendant Loya's best pretrial offer by eight times.

80.     Defendant Loya acted unreasonably in Plaintiff's first party claim. *See* Order on Loya's Supersedeas Bond, Swiech's Motion for Attorney's Fees & Costs and Swiech's Motion for Sanctions.

81.     Defendant Loya breached its duty of good faith and fair dealing to Plainitff. *Id.*

82.     Pursuant to NMSA 1978, § 39-2-1, the Court awarded attorney's fees to Plaintiff. *Id.*

83.     In addition, the Court stated on the record that "the conduct of [Fred Loya] failing to act in good faith with regard to the settlement conference certainly exists." *See* June 29, 2016 Transcript of Proceedings.

84.     Fred Loya failed to act in good faith when it attended a settlement conference with Plaintiff. *Id.*

## COUNT I – BREACH OF CONTRACT

85.     Plaintiff incorporates all prior allegations as if set forth herein in full.

86.     Plaintiff purchased auto insurance coverage from Defendant Loya, which included uninsured motorist coverage.

87.     Defendant Loya breached its contractual obligations to Plaintiff by wrongfully denying the full extent of uninsured coverage purchased by Plaintiff.

88.     Plaintiff was injured as a result of said breach.

## COUNT II-INSURANCE BAD FAITH

89.     Plaintiff hereby incorporates the foregoing allegations of the Complaint as if fully set forth below.

90.     Defendant Loya had a duty to act in good faith and deal fairly with Plaintiff.

91.     Defendant Loya willfully, recklessly and without regard for the rights of Plaintiff breached the duty of good faith and fair dealing owed to Plaintiff by knowingly committing the following acts:

      a.  Not attempting in good faith to effectuate a prompt, fair and equitable settlement of the claims of Plaintiff in which liability has become reasonably clear;

      b.  Compelling Plaintiff to institute litigation to recover amounts due under the policy

by offering substantially less than the amounts ultimately recovered by Plaintiff when Plaintiff made claims for amounts reasonably similar to amounts ultimately recovered;

c. Failing to promptly provide Plaintiff a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for the offer of a compromised settlement;

d. Failing to properly investigate the coverage available to Plaintiff; and

e. Placing its interest over its insured's interest by offering an amount substantially less than the amount ultimately recovered.

92.     Defendant Loya breached its duty of good faith and fair dealing to Plaintiff.

93.     Defendant Loya acted unreasonably in Plaintiff's first party claim.

94.     As a result of Defendant Loya's negligent, malicious, wanton, willful, intentional, and reckless acts, Plaintiff has been injured and damaged.

## COUNT III-VIOLATION OF UNFAIR INSURANCE PRACTICES ACT

95.     Plaintiff hereby incorporates the foregoing allegations of the Complaint as if fully set forth below.

96.     At all times material, there was in the State of New Mexico a statute, NMSA 1978, Section 59A-16-20, hereinafter the Unfair Insurance Practices Act, defining and prohibiting certain unfair and deceptive insurance practices.

97.     The actions of Defendant Loya, its agents, employees, and attorneys, as set forth above constitute unfair insurance trade practices prohibited by the Unfair Insurance Practices Act.

98.     Defendant Loya breached the Unfair Insurance Practices Act by knowingly committing the following acts:

a. Not attempting in good faith to effectuate a prompt, fair and equitable settlement

of the claims of Plaintiff in which liability has become reasonably clear.

    b. Compelling Plaintiff to institute litigation to recover amounts due under the policy by offering substantially less than the amounts ultimately recovered by Plaintiff when Plaintiff made claims for amounts reasonably similar to amounts ultimately recovered;

    c. Failing to properly investigate the coverage available to Plaintiff; and

    d. Failing to promptly provide Plaintiff a reasonable explanation for the basis relied on in the policy in relation to the facts or applicable law for the offer of a compromised settlement.

99. Defendant Loya breached its duty of good faith and fair dealing to Plaintiff.

100. Defendant Loya acted unreasonably in Plaintiff's first party claim.

101. As a result of Defendant Loya's breach, Plaintiff has been injured and damaged.

102. Plaintiff is entitled to recover attorney fees and costs in pursuing this action pursuant to NMSA 1978, Section 59A-16-30.

**WHEREFORE,** Plaintiff respectfully prays this Court for relief as follows:

a. For judgment against Defendant Loya, including both compensatory and punitive damages, together with all available interest at the maximum legal rate;

b. For Plaintiff's costs incurred in pursuit of this action including attorney's fees to the extent as permitted by law; and

c. For any and all relief to which the Court deems appropriate.

Respectfully submitted,

**CARTER & VALLE LAW FIRM, PC**

 /s/ Matthew J. Zamora
RICHARD J. VALLE, ESQ.
MATTHEW J. ZAMORA, ESQ.
Attorneys for Plaintiff
8012 Pennsylvania Circle, N.E.
Albuquerque, NM  87110
PH:    505-888-4357

```
 1   SECOND JUDICIAL DISTRICT COURT
     COUNTY OF BERNALILLO
 2   STATE OF NEW MEXICO

 3   NO:  D-202-CV-2014-00582

 4

 5   FRED LOYA INSURANCE COMPANY,

 6                  Plaintiff/Counter-Defendant,

 7   vs.

 8   THOMAS J. SWIECH,

 9                  Defendant/Counter-Plaintiff.

10

11

12        VIDEOTAPED DEPOSITION OF JEFFERY BARNARD

13                    July 21, 2015
                       11:21 a.m.
14               Carter & Valle, PC
          8012 Pennsylvania Circle, Northeast
15             Albuquerque, New Mexico

16

17        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
     PROCEDURE, this deposition was:
18
     TAKEN BY:   MATTHEW J. ZAMORA
19               ATTORNEY FOR DEFENDANT/COUNTER-PLAINTIFF

20

21

22   REPORTED BY: SUSAN L. FINDLEY, RPR
                  New Mexico CCR #77
23                New Mexico Depo
                  1100 Second Street, Northwest
24                Albuquerque, New Mexico 87102
                  (505)244-3376
25                setadepo@nmdepo.com
```



New Mexico Depo
(505) 244-3376 – setadepo@nmdepo.com

EXHIBIT
1

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Page 6

1  A   I'm a crisis intervention team officer. I
2  am a field training officer. We had a program called
3  DVSO, which was Domestic Violence Specialty Officer,
4  which I was part of. That pretty much covers
5  everything that I am right now.
6  Q   Can you describe your training?
7  A   I went through an approximate six-month
8  police academy. We have ongoing training every year
9  that's mandated by the State that we have to attend
10 that I've been a part of, as well as extra training
11 that's available to us, which I've taken courses from
12 time to time, such as VIN certification, interviews
13 and interrogations, and other classes that were
14 available to me.
15 Q   Can you describe the type of training
16 you've received? What type of classes and areas of
17 study?
18 A   Well, at the academy we have to go over
19 everything that the Department of Public Safety
20 mandates, which is going to include traffic accident
21 investigations, traffic violations, domestic violence
22 investigations, criminal investigations, including
23 property crimes, violent crimes, crimes against
24 children, and then different refreshers every year
25 that are mandated by the State, such as DWI. That

Page 7

1  pretty much covers it.
2  Q   Any other training that you can recall?
3  A   Not that I haven't already mentioned.
4  Q   Okay. I want to get right into it. We're
5  going to talk about the June 21st, 2013 incident. Do
6  you remember that?
7  A   Yes.
8      (Exhibit 1 was marked.)
9  Q   (By Mr. Zamora) And what I've done is I've
10 marked Exhibit 1, and it consists of 67 pages of what
11 I understand to be the incident report involving this
12 case. If you want to go ahead and look through that.
13 Is there any reason to dispute that that's the
14 incident report involving the June 21st, 2013
15 incident?
16 A   This looks like it's the incident report
17 from --
18     THE COURT REPORTER: This looks like what?
19     THE WITNESS: This incident report that was
20 done that day or -- that day. I don't know if it was
21 all finished that day, but through the course of this
22 investigation.
23 Q   (By Mr. Zamora) Remind me, you recall the
24 June 21, 2013 incident?
25 A   Yes.

Page 8

1  Q   How did you first become involved with
2  this?
3  A   I was dispatched to assist Officer Paul
4  Martin on what was originally coming in as a -- I
5  believe it came in as a shoplifting call originally.
6  The manager at Walgreens was calling in and saying
7  that a male was grabbing items from behind the
8  counter, and it looked like he was trying to jump
9  over into the pharmacy. He also mentioned that the
10 subject possibly had a knife in his pocket.
11     As we were en route to the call,
12 Officer Martin and I were advised that the subject
13 was leaving Walgreens and fleeing in a black vehicle.
14 It was described as could have either been a Ford
15 Mustang or possibly a Chevy at that point in time.
16     The caller believed that the vehicle had
17 gone east up Menaul and had went into the
18 Mission Hill Apartments, which was just east of the
19 Walgreens.
20     Officer Rich Whitten actually arrived on
21 scene before either of us did, and he started
22 checking the parking lot. Officer Whitten then
23 advised that he had found what he thought was the
24 vehicle, based off the description, and saw a female
25 exit the vehicle, and he had -- she had started

Page 9

1  walking away from the vehicle. He had contacted her.
2      Shortly after that myself and
3  Officer Martin arrived, and we were all speaking with
4  the female subject. During that time I could see the
5  general office area where Officer Whitten had told me
6  where the car was parked, and I saw a male subject
7  walking towards the car. And then I started walking
8  up that way because I thought it could possibly be
9  the other subject that was involved, based on the
10 call.
11     As I started approaching -- I was just
12 walking at that time -- the male subject started
13 walking away from that vehicle, so I started yelling
14 for him to come towards me. At that time the subject
15 started running away through the complex.
16 Q   Was he on foot?
17 A   Yeah. He was kind of heading south. He
18 had a pretty good head start on me, so I tried to
19 catch up as best as I could, but I lost visual of him
20 as I was going around the building, so I wasn't sure
21 where he was at. I continued to proceed towards
22 the -- I guess it would basically be like the south
23 side of that complex.
24     During this time Officer Martin had stayed
25 with the female that Officer Whitten had originally

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Pages 10..13 of 44

Page 10

1  got out with. Officer Whitten had gone -- he was
2  close to me, trying to assist me. Officer Martin
3  then advised that the male had doubled back during
4  this time, and was back at the vehicle, and was
5  leaving in the vehicle.
6            Shortly after he stated this, heard a very
7  loud engine sound coming around the corner. Then we
8  saw the vehicle. It appeared to be driving extremely
9  reckless and at a high rate of speed. Myself and
10 Officer Whitten backed up because we were concerned
11 that he could possibly hit us with the vehicle.
12           Shortly after the subject passed us, he
13 struck a Chevy Suburban which was backed up into a
14 parking spot. He kind of struck the corner of it,
15 the right front -- well, the passenger front side of
16 the vehicle, and pushed the Suburban into another
17 vehicle.
18           And then about -- just guessing, I thought
19 it was about 100 or 50 yards or so away, he was
20 parked up on the sidewalk. We ran over there. He
21 was getting out of the vehicle. As we were
22 approaching we gave the subject verbal commands to
23 get down on his -- get on the ground and put his hand
24 on top of his head. He wasn't really following those
25 commands very well. Officer Keith Sheley knocked him

Page 11

1  to the ground at that point.
2            And then we tried to get him in custody by
3  securing his arm. He was pulling away from us on the
4  ground. We got one arm, and then I -- we were able
5  to turn him over after -- to try to get the right
6  arm, and he had a knife or a box cutter in his hand
7  at that time. I grabbed that and threw it under the
8  vehicle, and then we were able to get him in
9  handcuffs. Called rescue for him at that time.
10           He was identified -- I don't know if I
11 identified him or somebody else identified him -- as
12 Brandon Sandoval. I stood by there for a few minutes
13 until other officers arrived. After that I was --
14 after that I didn't have any further contact with him
15 due to the resisting that had gone on.
16           My other involvement in the call was I went
17 to the vehicles that had been hit. I ran the license
18 plates. Mr., I think it's "Swiech," is how you
19 pronounce it, his vehicle came back to an apartment
20 at the complex. Couldn't find a phone number for it,
21 so I went and knocked on his door. I advised him of
22 what happened.
23           I was originally going to do a traffic
24 accident for that portion of the investigation. I
25 logged on a separate what we call a CAD, which is an

Page 12

1  incident number, to do that. But I was then
2  contacted by my sergeant, who advised that due to
3  the -- since it was such a negligent and reckless
4  act, that we were going to charge criminal damage
5  instead of making it a traffic accident. So I
6  canceled that case number, included the details in my
7  supplemental report to Officer Martin's original
8  report.
9            And then I transported the female, which I
10 believe her name was Kendra Smith, to the substation.
11 And from there I wrote my supplemental report until I
12 was done with it. There was -- there was a backpack
13 that we had found that we were able to -- that an
14 impact detective was able to find the owner for, that
15 had been stolen.
16           THE COURT REPORTER: That what was able to?
17           THE WITNESS: It was an impact detective.
18 It was a backpack that he had found in the vehicle
19 that had been stolen from him. I stood by until that
20 subject arrived. I don't remember his name. And I
21 gave him -- the property to him with the impact
22 detective's assistance. And that was Detective
23 Jeff Jones.
24           As soon as that was done, checked with
25 everyone to see if anyone needed anything else.

Page 13

1  Everyone advised that they were done with what I
2  needed to do, so I proceeded to leave. And that was
3  probably, give or take, around noon.
4            MR. GROSSMAN: Objection, nonresponsive.
5       Q  (By Mr. Zamora) And I appreciate you
6  describing your involvement in this case. I do have
7  some follow-up questions to get into more of the
8  details of what happened. What time were you
9  notified of the Walgreens incident?
10      A  It was approximately 4:01 a.m., in the
11 morning.
12      Q  And did you make it to speak with anybody
13 at Walgreens?
14      A  I never did.
15      Q  Was your first encounter with Brandon
16 Sandoval there at the apartment complex?
17      A  Yes.
18      Q  What time do you recall going to the
19 apartment complex?
20      A  It was dispatched as a priority one call.
21 I don't remember exactly how long it took me to get
22 there, but the response would have been fast. It's
23 our highest priority call. So I'm guessing, without
24 looking at anything, it probably took me less than
25 seven- to 10-minute range to get there.

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Pages 14..17 of 44

Page 14

1        From that point we were probably out with
2   the female for maybe around 10 minutes when we saw
3   the male, which was identified as Brandon Sandoval,
4   walking towards the vehicle.  And then I had the
5   contact with him after he had wrecked the vehicle and
6   was parked up on the curb.
7        Q     And you said that you were first notified
8   that it was a Mustang or Camaro.  Did you ever figure
9   out what type of vehicle it was?
10       A     It was a Chevy Camaro.
11       Q     And that's a sports car?
12       A     Yes.
13       Q     Who designated this incident as a priority
14  one call?
15       A     The 911 taker codes the calls depending on
16  what's going on.  Since it was in progress and he was
17  possibly armed, I'm guessing that was why they do it.
18  But it's up to the call taker for the 911 call to
19  designate the call.
20       Q     And you later identified the male subject
21  as Brandon Sandoval?
22       A     Yes.
23       Q     Did you know anything about this male
24  subject before you came to the apartment complex?
25       A     No.

Page 15

1        Q     And remind me, you -- who was dealing with
2   Kendra Smith?
3        A     Originally it was Officer Whitten that had
4   located her and stopped with her.  But when the foot
5   chase started, Officer Whitten went with me, and
6   Officer Martin stayed with Kendra Smith during that
7   time.
8        Q     How far were you from Officer Martin when
9   he was talking with Kendra Smith?
10       A     I would estimate within a few feet.
11       Q     And at what point did you notice Brandon
12  Sandoval?
13       A     I felt like it was about 10 minutes after
14  we were talking to her, because we had tried talking
15  to her for a while, if I'm recalling correctly, and
16  she was very uncooperative.  Officer Martin, I think,
17  had just placed her in a patrol vehicle.  Very
18  shortly after that I saw the male subject walking
19  towards the vehicle where the area of the vehicle was
20  that Officer Whitten told us.
21       Q     When you saw him approaching the vehicle,
22  what did you do?
23       A     I started walking towards the vehicle.
24       Q     To approach the individual?
25       A     Yes.

Page 16

1        Q     Brandon Sandoval?
2        A     Yes.
3        Q     When you went to approach him, then what
4   happened?
5        A     He was still a good distance ahead, and I
6   saw him go towards what I thought was the vehicle,
7   and then he started to turn around and walk back
8   towards the apartments in the complex from the
9   parking lot.  So I yelled for him to come to me, and
10  that's when he started to run.
11       Q     At that time did you realize that he was
12  intentionally trying to evade you?
13       A     Yes.
14       Q     And I believe you stated that you went
15  after him, but he already had a distance on you?
16       A     Yes.
17       Q     What did you do when you saw him run?
18       A     I started chasing after him.  I got on the
19  radio to advise that there was a foot chase.  And
20  then from there, he got to where the apartments were
21  located so fast that I just lost visual.  And then --
22  so I started slowing things down, and I was -- myself
23  and Officer Whitten were walking towards the south
24  side of the complex when --
25       Q     Is that when you heard the vehicles --

Page 17

1        A     Yeah.  We were on the south side of the
2   complex when we heard it.  So we had already gotten
3   past the initial buildings and gotten towards the end
4   of the buildings where the parking lot started again
5   on that side of the complex.
6        Q     When you heard the vehicle's engine, did
7   the engine start, or was it already running and
8   coming towards you?
9        A     It was already coming towards me.
10       Q     How loud was that sound?
11       A     It was really loud because I could -- I
12  specifically remember thinking that it's coming fast;
13  I needed to back up before it got towards me.
14       Q     And the Camaro comes around the corner
15  towards you; is that right?
16       A     Yeah.
17       Q     When you see the vehicle coming at you, how
18  fast do you think it was going?
19       A     I mean, just based off how fast it felt and
20  how fast I had to back up and the fact it was already
21  losing traction coming around the corner, I felt like
22  it had to have been close to 50 miles per hour, if
23  not in excess of 50 miles per hour.
24       Q     And this is taking place in an apartment
25  complex parking lot?

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Page 18

1    A    Yes.

2    Q    There were quite a few vehicles there?

3    A    Yes.

4    Q    And people live there?

5    A    Yes.

6    Q    How dangerous was Brandon Sandoval's

7    conduct?

8         MR. GROSSMAN:  Objection, form.

9         THE WITNESS:  I felt like it was extremely

10   dangerous.  I mean, I felt like he was going to hit

11   me at first, and I felt like he had no control of the

12   vehicle as he was driving through, just based off of

13   speed.  I felt like he would be unable to maneuver

14   out of the way of anything if anything had gotten in

15   his way.

16   Q    How did you feel when you thought that he

17   was going to hit you with the vehicle?

18   A    I felt like I needed to get out of the way

19   as fast as possible; otherwise, he could have killed

20   me.

21   Q    Were there any other officers with you that

22   had to get out of the way of the vehicle?

23   A    Officer Whitten.

24   Q    Officer Whitten got out of the way as well?

25   A    Yes.

Page 19

1    Q    Do you know if Officer Whitten felt the

2    same way that you did?

3    A    I know he was backing up towards the fence

4    as I did.  So I couldn't say how he felt, but his

5    actions seemed to demonstrate that he was concerned

6    that he was going to be hit by the vehicle.

7    Q    You said that it appeared that he was --

8    didn't have control of his vehicle.  Was that the

9    case when he slammed into the -- my client's vehicle?

10   A    Yeah.

11   Q    Describe that.  What did you witness there?

12   A    The vehicle, when it passed me, it was

13   losing traction.  It was screeching.  And then I just

14   heard the impact, and I saw it skid past that vehicle

15   and the other vehicle move into -- the Suburban move

16   into a vehicle that was parked.  And then it was -- I

17   mean, it hit at such a speed that even though it was

18   able to move a vehicle that was much larger than it,

19   it kept going.  It obviously had to have been

20   completely totaled with the impact, and it was able

21   to go another -- what I believe was about 150 yards.

22   Q    Did you understand that Brandon Sandoval

23   was -- when he was in the Camaro, was attempting to

24   flee officers?

25   A    Yes.  And I believe just -- where

Page 20

1    Officer Martin was, that's where all of our patrol

2    vehicles were parked, and that was near the main

3    entrance, so I felt like he was specifically going

4    around to the other side where we were at, because

5    there was -- there's another exit on the other side.

6    I don't know if it was open at the time or not.  But

7    I felt like he was purposely going that way because

8    of the patrol vehicles blocking the main entrance

9    that we had come in at.

10   Q    What did you see after the collision as far

11   as wreckage?

12   A    At first I just -- I saw the initial

13   damage, and then it was pushed over.  But we were --

14   we were going towards the vehicle after it happened

15   because we saw him, you know, continue and wreck out

16   near -- wreck out again onto the sidewalk near

17   another building.  But when I went back, I saw that

18   it was pushed, you know, all the way over and had

19   caused damage to the other vehicle.

20   Q    Was your concern primarily with Brandon

21   Sandoval, not the property damage at the time?

22   A    At the time, because I didn't believe

23   anybody was in the vehicle, and I felt like he was

24   still a danger.

25   Q    Did -- and you said that Brandon

Page 21

1    Sandoval -- the Camaro ended up on the sidewalk?

2    A    Yeah.  Like the -- I mean, it was kind of

3    in a parking spot, but the front wheels of the

4    vehicle were up on the sidewalk area.

5    Q    So it came up on the lip of the sidewalk --

6    A    Yeah.

7    Q    -- over that edge?

8    A    Right.  If I'm remembering correctly.

9    Q    When you encountered Brandon Sandoval after

10   the wreck, was he still attempting to evade you?

11   A    He was definitely not complying with us.

12   He was standing there, but his -- he wasn't following

13   verbal commands to get on the ground, put his hand on

14   top of his head.  There was concern that he was

15   getting ready to run again when Officer Shelay

16   knocked him to the ground.

17   Q    Was there concern that he would harm you

18   when you tried to detain him?

19        MR. GROSSMAN:  Objection, form, leading.

20        THE WITNESS:  Yeah.  And that was part of

21   the reason that -- when he got out of the vehicle,

22   because of the previous information that I had that

23   he could possibly have a knife, and the fact that he

24   wasn't -- I slowed down, and I drew my side arm, and

25   I was giving him verbal commands at gun point to get

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Page 22

1  on the ground and put his hands on his head, and he
2  wasn't doing that.  And while he was concentrating on
3  me, Officer Sheley approached him from the side and
4  knocked him to the ground.
5      Q     Did you ever determine whether he had a
6  knife or anything on him?
7      A     He did, because he didn't have it when I
8  originally gave him the commands, but as we were
9  trying to grab both of his hands and put him in the
10 handcuffs, he had a knife that -- he had grabbed the
11 knife from one of his pockets at some point, because
12 it was in his hand when I turned him over.
13     Q     How concerned are you for your safety -- or
14 how concerned were you for your safety when you saw
15 that?
16     A     I was very concerned.  The vests that we
17 wear do not stop any sort of penetrating knife or
18 anything like that.  It will go straight through our
19 vest.  So it's very concerning, especially because we
20 couldn't see his hand that was under him, so he could
21 have stabbed me right when I was rolling him over.
22     Q     Did you eventually get him into custody and
23 secure, for your safety?
24     A     Yes.
25     Q     After you did that, then what happened?

Page 23

1      A     We started paramedics for him right away.
2  He had a laceration to his head.  And then other
3  officers arrived on scene.  I moved -- I left him
4  with other officers, and then I went to eventually
5  contact Mr. Swiech about the vehicles that had been
6  hit at the complex.
7      Q     Describe that conversation with Mr. Swiech.
8      A     I ran a license plate.  I got his name and
9  apartment number.  I knocked on his door.  I asked
10 him -- you know, I just asked him what his name was
11 and if the Suburban that was outside belonged to him.
12 He advised it was.  I told him that the guy had been
13 fleeing through the complex in a vehicle and struck
14 his vehicle.
15     Q     Anything else that you recall from that
16 conversation?
17     A     He just -- not from the conversation.  I
18 just remember him walking out and seeing the vehicle.
19     Q     Describe the damage done to the Camaro.
20     A     It had heavy front-end damage.  It appeared
21 to be disabled, from what I could tell.  The damage
22 was -- seemed to be more on the left front end, but
23 it was kind of throughout because the impact was so
24 great.
25     Q     And that's the driver's front end?

Page 24

1      A     Yeah.
2      Q     Anything else you recall from the damage to
3  the Camaro?
4      A     Not specifically.  I honestly didn't look
5  at the vehicle too much after everything had
6  happened.
7      Q     Describe the damage that you recall to
8  Mr. Swiech's vehicle.
9      A     The passenger front side had heavy damage,
10 and then it looked like the -- I mean, if I remember
11 correctly, I believe the wheel was pushed in a bit on
12 the right side.  And then it also had some damage on
13 the driver's front end from where it had been pushed
14 into the other vehicle it was parked next to.
15     Q     Anything else you recall regarding his
16 vehicle?
17     A     No, not specifically.
18     Q     And how about the other vehicle?  I believe
19 it was a GMC Sierra.
20     A     That's what I recall.  It had moderate
21 damage, but it wasn't too bad.  It was -- it looked
22 more -- it looked like it was still functioning.
23 Most of it was cosmetic damage, from what I can
24 recall.
25     Q     I believe you said already the Camaro --

Page 25

1  Brandon Sandoval hit Mr. Swiech's vehicle with enough
2  force to push it into the GMC?
3      A     GMC.
4      Q     Right.
5      A     And that was on the -- and it was on the --
6  that vehicle was parked straight, so it was pushed
7  into the rear end of the vehicle, the driver's rear
8  end.
9      Q     What I'll do is I'll have you look at
10 Exhibit 1.  And I believe Page 29, 30, and 31 is the
11 report that you prepared.  And if you could take a
12 look at that and confirm that for me, that would be
13 great.
14     A     Yes.
15     Q     And are you still ID Number 5250?
16     A     Yes.
17     Q     And going through the narrative of your
18 report, is that all consistent with what you
19 witnessed on the date of the incident and what you've
20 told us today?
21     A     Yes.
22     Q     I also want to point you to Page --
23 actually, let me get the other page.  I want you to
24 point me to Page 1 of Exhibit 1 and Page 32 of
25 Exhibit 1 where other officers describe Brandon

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Page 26

1  Sandoval's conduct as reckless.  Do you have any
2  reason to dispute those officers' description of
3  Brandon Sandoval's conduct as being reckless?
4          MR. GROSSMAN:  Objection, form.
5          THE WITNESS:  No, I do not.
6      Q    (By Mr. Zamora)  Why is that?
7      A    He showed a clear disregard for other
8  people's property and other people's well-being by
9  the way he was maneuvering that vehicle, and his
10 disregard for anybody else that was at that complex.
11     Q    How dangerous was his conduct?
12         MR. GROSSMAN:  Objection, form.
13         THE WITNESS:  I believe that -- I mean, I
14 believe it was very fortunate that only property was
15 damaged and that nobody was seriously injured in the
16 accident.
17     Q    (By Mr. Zamora)  Does that include yourself
18 and the other officers?
19     A    Yes.
20         MR. ZAMORA:  I'll pass the witness.
21               EXAMINATION
22 BY MR. GROSSMAN:
23     Q    You were reporting to -- or in reference to
24 a larceny that had occurred at the Walgreens?
25     A    Right.  Larceny or shoplifting.

Page 27

1      Q    Shoplifting.  And -- but you didn't
2  actually report to Walgreens; you reported to the
3  parking lot of the apartment complex?
4      A    Right.
5      Q    And you say when you got there, there was a
6  lady suspect named Kendra Smith that was exiting the
7  suspect vehicle, this Camaro?
8      A    That's what Officer Whitten had advised us
9  over the radio.
10     Q    All right.  And who did Kendra Smith turn
11 out to be?
12     A    I believe her father was the owner of the
13 vehicle, and she had been the female that was with
14 Brandon Sandoval.
15     Q    All right.  Do you know whether or not
16 Kendra Smith, as the daughter of -- is it Kenneth
17 Smith that owned the Camaro?
18     A    That's what I recall.
19     Q    Were you advised as to whether Kendra Smith
20 had permission from her father to have possession of
21 that vehicle at the time?
22     A    I did not conduct any part of that
23 investigation, so I would not know.  I personally did
24 not talk to anyone.
25     Q    Do you know how it would have been that

Page 28

1  Kendra Smith would have obtained the keys to the
2  Camaro?
3          MR. ZAMORA:  Objection, foundation.
4          THE WITNESS:  I do not know how Kendra
5  Smith got the vehicle.
6      Q    (By Mr. Grossman)  All right.  And what
7  part of the vehicle did Kendra Smith exit from when
8  you arrived at the scene?
9      A    From what I recall -- and I could be
10 wrong -- but I believe Officer Whitten advised that
11 she had gotten out of the passenger side of the
12 vehicle.
13     Q    Front or back?
14     A    I think it was only a two-door, if I'm
15 remembering right, but I believe it was the right
16 front side.
17     Q    And you had mentioned that Kendra Smith,
18 who exited this Camaro, was being uncooperative.
19 What do you mean by that?
20     A    I think Officer -- from what I recall,
21 Officer Martin was asking her what they were doing at
22 the Walgreens where the male that she was with, based
23 on the original call, was at, and she was just not
24 providing any information.
25     Q    And so Kendra Smith was actually with

Page 29

1  Brandon Sandoval at the Walgreens, based on your
2  investigation?
3      A    That's the way I understand it, but I
4  didn't -- like I said, I didn't go to the Walgreens
5  and conduct any of that investigation there.  But
6  that was what I was led to believe based off the
7  original comments on the call.
8      Q    Was your impression that Kendra Smith was
9  some type of hostage, or was she a willing
10 participant with Mr. Sandoval?
11     A    I believe that she was -- that they were
12 involved together.
13     Q    And what do you mean by that?
14     A    That they had chosen to -- I mean, that
15 they were with each other by choice.  I don't know if
16 they had any sort of romantic relationship, but I
17 didn't believe there to be any -- there wasn't
18 anything that led me to believe that she was being
19 held against her will or that she wasn't there by her
20 own choice.
21     Q    All right.  Do you know whether or not this
22 Kendra Smith was prosecuted in any fashion for this
23 offense?
24     A    Yes.  She was arrested for multiple things
25 as well, from my understanding.

Fred Loya Insurance Company v Swiech
Barnard, Jeffery on 07/21/2015

Page 38

1  the video.
2       MR. ZAMORA:  Okay.  But being able to use
3  the video for -- at trial testimony.
4       That way, we don't have to call you in for
5  trial in October.  All right?
6       MR. GROSSMAN:  Yeah, unless something comes
7  up.  I mean, I don't know at this point.  I'm saying
8  I don't -- I can't see an objection right now to
9  playing the video, if that's what you want.
10               FURTHER EXAMINATION
11  BY MR. ZAMORA:
12       Q    And if that's the case, we may have -- we
13  may be able to avoid even having to call you in.  But
14  let me just ask you, what's the best way to get ahold
15  of you, address and phone number?  I assume we could
16  probably just go through APD, through your work,
17  instead of a personal address?
18       A    Right.
19       Q    Can you give me your work and contact
20  information?
21       A    I work at the Northeast Substation, so
22  anything that -- anytime you call that substation,
23  they'll leave me a message, and I'll get it as soon
24  as I come in.  If you need my cell phone number, I
25  don't -- I'm not opposed to providing that, if you

Page 39

1  need it.
2       Q    What is that?
3       A    It's (505)220-8269.
4       Q    And just one more question.  I understand
5  based on the -- Exhibit 1, the police report, that
6  there were a lot of moving pieces as far as criminal
7  conduct.  What is your understanding of Brandon
8  Sandoval's conduct in all of that?
9       MR. GROSSMAN:  Objection, form and
10  foundation.
11       THE WITNESS:  He was arrested for several
12  felonies that night, and his conduct was extremely
13  negligent, reckless, and violent.
14       Q    (By Mr. Zamora)  And did his -- the
15  criminal charges that were brought against him, did
16  that include additional criminal conduct prior to the
17  apartment complex incident?
18       A    Yes.  From my understanding, there was
19  multiple incidents that they were able to place him
20  that had happened up to that point.  It seemed like
21  he had committed several crimes at several locations
22  that night.
23       There was -- I mean, there was auto
24  burglaries that had popped up at the Mission Hills
25  Apartments that appeared to be related, from my

Page 40

1  understanding.  I knew there was an incident at
2  Walmart prior to that call.  And, of course, there
3  was the Walgreens incident.
4       Q    And then when he was taken into custody,
5  you said that he attempted to break out?
6       A    Yes.  I think it was sometime early
7  afternoon, around one or so, 1300 hours -- I could be
8  wrong with the time, but I believe that was close to
9  it.  He had complained that his -- that his handcuff
10  was too tight.  One of the detectives that was at the
11  substation, I believe, loosened his handcuff.  He was
12  able to slip his hand out of the handcuff.
13  Apparently there was some sort of issue with the door
14  lock in the holding cell.  He fled from the
15  substation.
16       And then he had attempted to steal another
17  vehicle.  I don't know where that was at.  I remember
18  that, from what I was told, the owner of that vehicle
19  had caught him in the act and had detained him, at
20  which time he was taken back into custody.
21       MR. ZAMORA:  No further questions.
22       MR. GROSSMAN:  Reserve.
23       THE VIDEOGRAPHER:  This concludes the
24  deposition of Officer Jeffery Barnard.  Number of
25  DVDs used was one.  We are going off the record, and

Page 41

1  the time is 12:08.
2       (The deposition concluded at 12:08 p.m.)

Page 1

STATE OF NEW MEXICO
COUNTY OF BERNALILLO                )
SECOND JUDICIAL DISTRICT            )
COURT                               )
                                    )
FRED LOYA INSURANCE                 )
COMPANY,                            )
                                    )
Plaintiff/Counter-Defendant,        )
                                    )
V.                                  )   D-202-CV-2014-00582
                                    )
THOMAS J. SWIECH,                   )
                                    )
                                    )
Defendant/Counter-Plaintiff.        )

------------------------------------

ORAL DEPOSITION OF

ADRIANE SEALEY

AUGUST 27, 2015

VOLUME 1

------------------------------------


     ORAL DEPOSITION OF ADRIANE SEALEY, produced as a witness

at the instance of the DEFENDANT, and duly sworn, was taken in

the above-styled and numbered cause on the 27th day of

August, 2015, from 2:59 p.m. to 4:25 p.m., before Carissa

Crocker, CSR in and for the State of Texas, reported by machine

shorthand, at the offices of Gulf Stream Court Reporting,

Legacy Office Centers, 8000 IH-10 West, Suite 600, San Antonio,

Texas 78230, pursuant to the Texas Rules of Civil Procedure and

the provisions stated on the record or attached hereto.

Gulfstream Legal Group

Tel: (210) 490-6444                          Fax: (210) 579-6507

Electronically signed by Carissa Crocker (501-366-571-6219)
Electronically signed by Carissa Crocker (501-366-571-6219)

99f86d0e-0f63-42b1-b1f1-f2ec20c918af

Page 18

1   Q.   Have you looked at the claims file at any point?
2   A.   The only thing I looked at was the discovery, some of
3   the pleadings, and when the -- admissions. I am familiar
4   with the police report and the declaration page of the policy.
5   Q.   How long did you spend looking at all of those
6   documents?
7   A.   I don't -- a few days.
8   Q.   And after you have reviewed all of those documents,
9   what is your understanding of the facts in this case?
10        MR. GROSSMAN: Objection to the form of that
11   question. You can answer.
12   A.   The case involves Mr. Swiech's vehicle being struck
13   in a parking lot, in the settlement of property damage claim.
14   Q.   (BY MR. ZAMORA) What do you -- what do you know
15   about how the property damage was caused?
16   A.   The property damage was caused by a vehicle that was
17   in a parking lot of an apartment complex and collided with his
18   parked vehicle.
19   Q.   Do you know why that vehicle park -- crashed into
20   Mr. Swiech's vehicle?
21   A.   I don't know why it crashed into his vehicle.
22   Q.   You said that you read -- you reviewed the police
23   report. What is your understanding from the police report as
24   to how this crash occurred?
25   A.   The police report indicates that the vehicle was

Page 20

1   A.   Based on the police report.
2   Q.   Yes?
3   A.   Yes.
4   Q.   You said you don't know any other information or you
5   haven't found any other information involving the loss that
6   happened to Mr. Swiech's?
7   A.   The property damage claim for his vehicle. I mean,
8   his vehicle was damaged when it was struck by this car in the
9   parking lot. So that was the -- premise of this claim that
10   was being made.
11   Q.   Okay. And prior to this -- prior to this deposition,
12   did you review the deposition testimony of Officer Bernard?
13   A.   No.
14   Q.   Do you know who Officer Bernard is?
15   A.   I saw his name on -- on a police report document.
16   Q.   You have no reason to dispute that he was the
17   investigating officer who investigated this incident?
18   A.   No.
19   Q.   And then you said that you looked at the declaration
20   page?
21   A.   Yes.
22   Q.   Let me ask you, does Mr. Swiech own an insurance
23   contract with Fred Loya?
24   A.   Currently or at the time of the loss?
25   Q.   At the time of the loss.

Page 19

1   driving at a high rate of speed in the parking lot. And when
2   the police officer came around and heard the impact and -- and
3   came to the vehicle, it had already collided with the vehicle.
4   Q.   What else do you understand from the police report?
5   A.   That the gentleman that was driving the vehicle was
6   attempting to evade the police.
7   Q.   What else do you understand from the police report?
8   A.   The information that's on the police report that
9   indicates that there had been a, I guess, alleged theft or a
10   theft at a Walgreens and they were looking for the car that
11   collided with Mr. Swiech's vehicle.
12   Q.   Did --
13   A.   They located it in the apartment complex and the
14   vehicle -- or the driver of the vehicle was attempting to leave
15   the apartment complex when he struck Mr. Swiech's vehicle.
16   Q.   And you said earlier that he was attempting to flee;
17   is that right?
18   A.   That's what the police report indicated.
19   Q.   A flee from police officers to be more specific; is
20   that right?
21   A.   There were police officers in the apartment complex
22   looking for that vehicle.
23   Q.   But from your understanding, that vehicle was
24   attempting to flee from police officers based on the police
25   report?

Page 21

1   A.   Yes.
2   Q.   And at the time of the loss, he had contracted for
3   uninsured/underinsured motorist coverage?
4   A.   Yes.
5   Q.   And in this case, just to clarify, this is a
6   first-party claim for an uninsured motorist coverage, correct?
7   A.   Yes.
8   Q.   Okay. And because Mr. Swiech's had a policy in
9   effect at the time of the crash, that means that he paid for
10   that coverage, right?
11   A.   Yes.
12   Q.   And since Mr. Swiech's is a first-party insured, I
13   want to ask you: What are Fred Loya's duties to its
14   first-party insurers?
15        MR. GROSSMAN: Objection, calls for a
16   conclusion.
17        MR. ZAMORA: And, again, Mr. Grossman, I am
18   going to ask that you leave it to form and foundation.
19        MR. GROSSMAN: That's my form objection --
20        MR. ZAMORA: You can answer.
21        MR. GROSSMAN: That's my form objection. You
22   can answer.
23   A.   Our duties are to fairly investigate and handle and
24   settle claims that are submitted to us by our insureds.
25   Q.   (BY MR. ZAMORA) Any other duties to -- as

6 (Pages 18 to 21)

Page 22

```
1   first-party insureds?
2           MR. GROSSMAN: Same objection. Form.
3       A   Our duty to our insureds is to handle their claims
4   fairly and pay the claims that we owe.
5       Q.  (BY MR. ZAMORA) Is there a difference between
6   first-party and third-party claims?
7       A.  First-party claims are contractual coverage.
8   Third-party claims are liability cases that our insurers become
9   legally responsible for paying.
10      Q.  Are there any differences between the two -- any
11  other differences between the two? Let me rephrase that.
12          MR. GROSSMAN: Objection. Form.
13      Q.  (BY MR. ZAMORA) And let me -- let me re-ask that.
14  Any -- and other differences between first-party
15  and third-party claims?
16      A.  No. The insured pays for the coverage, the
17  contractual coverage that we have. That's the only difference.
18      Q.  Is there any different training for adjusters when
19  they are dealing with first-party claims versus third-party
20  claims?
21      A.  No.
22      Q.  Would you agree that Fred Loya is responsible for
23  having rules on how to handle claims?
24          MR. GROSSMAN: Objection. Form. Go ahead.
25      A.  We establish guidelines on the handling of our claims
```

Page 23

```
1   for all of your claims.
2       Q.  (BY MR. ZAMORA) And you call them guidelines?
3       A   They are industry guidelines.
4       Q   Tell me about those guidelines.
5           MR. GROSSMAN: Objection. form. Go ahead.
6       A.  The guidelines that I would say are industry
7   guidelines for all claims is that you -- you work to fairly and
8   timely investigate coverage, liability, damages, and pay the
9   claims as promptly as you can. That's -- that's the guidelines
10  that we follow.
11      Q.  (BY MR. ZAMORA) Okay. Any other guidelines?
12      A.  No.
13      Q.  Okay. Would you agree that when Fred Loya says to
14  its insured that it's going to do something, that Fred Loya
15  must do what it says it will do?
16          MR. GROSSMAN: Objection, form.
17      A.  Yes.
18      Q.  (BY MR. ZAMORA) Would you agree that Fred Loya must
19  tell the truth?
20      A   Yes.
21      Q.  Would you also agree that Fred Loya must be honest?
22      A.  Yes.
23      Q.  Must Fred Loya be prompt?
24      A   Yes.
25      Q.  How about fair?
```

Page 24

```
1       A.  Yes.
2       Q.  Okay. Must Fred Loya follow its claims manual?
3           MR. GROSSMAN: Objection, form. Go ahead.
4       A.  Where there is a manual, yes.
5       Q.  (BY MR. ZAMORA) Okay. And if Fred Loya says one
6   thing, it's not allowed to do the other, correct?
7           MR. GROSSMAN: Objection, form. Go ahead.
8       A.  Yes.
9       Q.  (BY MR. ZAMORA) Is Fred Loya allowed to bait and
10  switch?
11          MR. GROSSMAN: Objection, form. Go ahead.
12      A.  No.
13      Q.  (BY MR. ZAMORA) So Fred Loya cannot lie?
14          MR. GROSSMAN: Objection, form. Go ahead.
15      A.  Yes.
16      Q.  (BY MR. ZAMORA) And Fred Loya cannot misrepresent?
17      A.  That is correct.
18      Q.  Fred Loya cannot cheat?
19      A.  That is correct.
20      Q.  Fred Loya cannot trick?
21      A.  That is correct.
22      Q   And it cannot promise and then not deliver?
23          MR. GROSSMAN: Objection, form.
24          MR. ZAMORA: You can answer.
25      A.  That is correct.
```

Page 25

```
1       Q.  (BY MR. ZAMORA) And Fred Loya can't say that it's
2   going to pay the loss and then not pay the loss; is that right?
3           MR. GROSSMAN: Objection, form. Go ahead.
4           THE WITNESS: Can you repeat the question,
5   please?
6       Q   (BY MR. ZAMORA) Yeah, of course.
7           Fred Loya cannot say that it's going to pay a
8   loss and then not pay the loss; is that right?
9           MR. GROSSMAN: Object to form. Go ahead.
10      A.  That's correct, but --
11          THE WITNESS: Can I elaborate?
12          MR. GROSSMAN: Yeah.
13      A.  Okay. So the question asked is, "We cannot say we
14  are going to pay a loss and then not pay a loss?"
15          If we owe the loss, we must pay the loss. If we
16  initially say we are going to cover a loss and then additional
17  facts come forward that would indicate that something has
18  changed in the claim, perhaps, coverage or some other issues,
19  then we would not then owe the coverage at that point in time.
20          So there can be cases where we would initially
21  say we would cover a loss and then something could change those
22  circumstances. But if we owe the loss, we owe to pay the loss.
23      Q.  (BY MR. ZAMORA) Okay. You said other additional
24  facts could change that, what -- what type of facts?
25      A.  There could be several other circumstances that come
```

7 (Pages 22 to 25)

Electronically signed by Carissa Crocker (501-366-571-6219)
Electronically signed by Carissa Crocker (501-366-571-6219)                    99f86d0e-0f63-42b1-b1f1-f2ec20c918af

Page 30

1  Q. (BY MR. ZAMORA) Any other standards for the prompt
2  investigation of claims?
3  A. No.
4  Q. How did you learn of these standards?
5  A. Industry standards. I have been handling claims in
6  all states the same way for as long as I have been an adjuster.
7  I personally don't believe there is any other way to handle a
8  claim. You know, the fastest you can get to it, the faster you
9  investigate it. The faster you assist your insured, the
10 better. That goes across the board for any state.
11 Q. But do those standards change between state to --
12 state and another state?
13 A. For all, they're pretty much the same. Most require
14 a prompt response within 30 days to the insured, prompt
15 settlement upon knowing that you owe the claim.
16 Q. And you said you have to deal with the prompt
17 investigation?
18 A. Yes.
19 Q. Okay.
20 A. Prompt and reasonable.
21 Q. And after the investigation if you decide that you
22 owe the claim, you pay it?
23 A. Yes. When we have the information that we need to
24 establish that we owe the claim and we have the documents that
25 we need to know what the damages are, we would to pay the

Page 31

1  claim.
2  Q. Are these standards bright-line-rules?
3  MR. GROSSMAN: Objection, form.
4  THE WITNESS: Can you restate the question?
5  Q. (BY MR. ZAMORA) Yeah. Let's -- I'm still on the
6  topic of New Mexico standards for the prompt investigation of
7  claims. Are there -- are there bright-line-rules in regards to
8  these standards?
9  A. I don't know if I understand the word "bright-line."
10 Q. Are they strict standards? Are they soft standards?
11 A. Oh, they're the -- they're the standards. They're --
12 we -- we don't, you know, deviate from the general handling in
13 the standards set forth in the -- in the state.
14 Q. Are you required to abide by those standards?
15 A. All insurance companies are required to abide by
16 those standards.
17 Q. How long does Fred Loya have to act on information
18 from its insureds?
19 A. As far as -- can you please elaborate, or are you
20 looking for --
21 Q. As far as making a decision.
22 MR. GROSSMAN: Objection, form. Go ahead.
23 A. I believe it's 45 days.
24 Q. (BY MR. ZAMORA) Is there any reason that Fred Loya
25 would ignore information from it's insureds?

Page 32

1  A. No.
2  Q. All right. Have you spoken with any of the witnesses
3  in this case?
4  A. No.
5  Q. Okay. Do you know if anybody else from Fred Loya has
6  spoken with the witnesses in the -- in this case?
7  A. I don't know.
8  Q. Is there a way to find out?
9  A. The only way I would have to find out would be to go
10 back and look through the entire claim file. But I don't have
11 any knowledge that anyone else has spoken to any of the
12 witnesses, but I don't know.
13 Q. Is that needed to investigate certain claims, to
14 speak with the witnesses?
15 A. Some claims, yes.
16 Q. Would you agree that Fred Loya must speak with
17 witnesses or people within claims of 30 days or Fred Loya must
18 explain why it has not done so?
19 A. I don't. I don't know on the "must speak to all
20 witnesses within 30 days." There are cases and instances where
21 we don't need to speak with witnesses. We typically will only,
22 you know, seek out and speak to witnesses if there are disputed
23 facts to the loss.
24 Q. Do you know how long Fred Loya has in New Mexico to
25 open a claim file for its insureds?

Page 33

1  A. 15 days.
2  Q. Do you know if the seriousness of the claim
3  influences the speed at which Fred Loya must act?
4  A. Can you repeat that please?
5  Q. Does the seriousness of the claim influence the speed
6  at which Fred Loya must act?
7  A. No.
8  Q. Is each claim handled at the same speed?
9  MR. GROSSMAN: Objection, form.
10 A. Generally.
11 Q. (BY MR. ZAMORA) I think you -- I want to -- I want
12 to go back down through the process of the adjuster, and I
13 think -- let me know if I am wrong, but I think the first thing
14 that you described was it was the adjuster's job to determine
15 if there was available insurance coverage, correct?
16 A. Yes.
17 Q. Okay. And in this case you determined that
18 Mr. Swisch had coverage?
19 A. Yes.
20 Q. Okay. And you determined that because you paid him
21 for at least a portion of damages from our perspective,
22 correct?
23 A. Yes.
24 Q. Okay. And then -- again, tell me if I am wrong; then
25 after you determined whether there is coverage, you then decide

9 (Pages 30 to 33)

Page 34

1  who is responsible for the accident, correct?
2      A.  Yes.
3      Q.  Now the -- the part where you determine whether there
4  is liability?
5      A.  Yes.
6      Q.  Okay.  And at that point, you determine who the tort
7  feasor is and whether they are liable for anything?
8      A.  Yes.
9      Q.  And in this case, is it your understanding that
10 Brandon Sandoval was a tort feasor?
11     A.  Yes.
12     Q.  Okay.  And you agree that Brandon Sandoval was
13 uninsured?
14     A.  Yes.
15     Q.  And you determined that because you paid for
16 uninsured motorist coverage, correct?
17     A.  Yes.
18     Q.  Would you also agree that this is a clear liability
19 case?
20     A.  Yes.
21     Q.  And that's because 100 percent of the collision was
22 caused by Brandon Sandoval, right?
23     A.  Yes.
24     Q.  And then after you've determined whether there's
25 coverage and then who is liable, then you determine damages; is

Page 35

1  that right?
2      A.  Yes.
3      Q.  And you figure out how much -- how much is owed to
4  your insured?
5      A.  Yes.
6      Q.  And I think that you said this, but you would agree
7  that in handling claims, if Fred Loya owes it, it pays it?
8      A.  Once we determine the damages that we owe, we pay the
9  claims, yes.
10     Q.  When you dealt with property damage claims, was it --
11 was it common to deal with partial payments?
12     A.  Yes.
13     Q.  And then this is a very simple question, but I just
14 want to make sure that I have it right.
15         After you determined how the damages are owed,
16 if they are owed and they are paid, then the case is done
17 assuming that the insured accepts the damages offer.
18     A.  Yes, most typically.
19         MR. ZAMORA:  Okay.  All right.  And you know
20 what, we are coming up at an hour.  Do you want to take a
21 five-minute break, -- five, ten minute break?  I maybe have
22 another 15, possible 20 minutes.
23         THE WITNESS:  If you would like to.
24         MR. ZAMORA:  Okay.  Let's go ahead and just take
25 a quick break before I get into a new line of questioning.  We

Page 36

1  will go off the record.
2         (Break taken from 3:49 p.m. to 3:56 p.m.)
3      Q.  (BY MR. ZAMORA)  Ms. Sealey, after we have taken a
4  break, is there any changes to your prior testimony that we
5  need to make today?
6      A.  No.
7      Q.  All right.  I want to talk to you about Judge Lopez's
8  orders in this case.  Are you aware of those two orders?
9      A.  No.
10     Q.  You're not aware of the orders where he states that
11 Mr. Swiech is not limited to $10,000 in the property damage
12 limits?
13     A.  No, I haven't seen the order.
14     Q.  Okay.  Without seeing the order, are -- do you have
15 any awareness that those -- that that was a decision by Judge
16 Lopez?
17     A.  No.
18     Q.  Okay.  So at the same time, you're not aware of Judge
19 Lopez's orders that is entitled -- entitling Mr. Swiech to
20 additional policy of limits following a trial on the issue of
21 damages?
22         MR. GROSSMAN:  Objection to form, but go ahead.
23     A.  No.
24     Q.  (BY MR. ZAMORA)  Okay.  Are you aware that
25 Mr. Swiech's is making a claim for the additional $25,000 in

Page 37

1  coverage?
2      A.  Yes.
3      Q.  Would you agree that Fred Loya sued Mr. Swiech in
4  attempt to limit its exposure?
5         MR. GROSSMAN:  Objection, form.  Go ahead.
6      A.  Can you restate that, please?
7      Q.  (BY MR. ZAMORA)  Yeah.  Yeah, that's fine.  Would
8  you -- Fred Loya sued Mr. Swiech in this case, correct?
9      A.  For -- we have filed a motion, yes, for summary
10 review of this matter.
11     Q.  Are you aware of Fred Loya insurance company's
12 complaint against Mr. Swiech?
13     A.  Haven't reviewed it.
14     Q.  Okay.  But you're aware that Fred Loya claims to be
15 the plaintiff and made its insured Mr. Swiech the defendant?
16     A.  Yes.
17     Q.  Okay.  And Fred Loya did that in attempt to limit him
18 to $10,000?
19         MR. GROSSMAN:  Objection, form.
20     A.  We -- we sought out the opinion on the -- the
21 payment, you know, that you're seeking in excess of the
22 property damage amount which we paid.
23     Q.  (BY MR. ZAMORA)  And that issue has been resolved
24 already, correct?
25     A.  No.

10 (Pages 34 to 37)

Electronically signed by Carissa Crocker (501-366-571-6219)
Electronically signed by Carissa Crocker (501-366-571-6219)                    99f86d0e-0f63-42b1-b1f1-f2ec20c918af

Page 46

1    A.  That I am aware of --
2    Q.  So the punitive damages weren't included in the
3  $10,000 decision?
4    A.  We settled the claim up to the maximum of his policy
5  limit in an effort to settle his -- his claim and his damages.
6    Q.  Okay.  If Fred Loya admitted the claim up and they
7  are warranted, would it have paid it for punitive damages?
8        MR. GROSSMAN:  Objection, form.
9    A.  We would pay a claim up to the available policy limit
10  to resolve his claim and damages.
11    Q.  (BY MR. ZAMORA)  And -- and you're are not answering
12  my question, and I just want to make sure that you understand
13  it for me.
14        If Fred Loya, after doing its investigation and
15  determination on damages, determined that punitive damages are
16  warranted, would it pay it for -- or would it pay punitive
17  damages?
18        MR. GROSSMAN:  Objection, form.
19    A.  I am not -- I am not trying to be evasive in any way.
20  But I will tell you that the majority of the policies don't
21  discuss or warrant punitive damages.  Most insurance policies
22  don't allow for punitive damages.  We do factor in all factors
23  involved in a claim in our efforts to try to settle on behalf
24  of -- you know, and for the insured.
25        In this claim, my understanding is that we

Page 47

1  settled up to the policy limit in an effort to extinguish any
2  and all claims that Mr. Swiech had.
3    Q.  Okay.  You stated earlier that -- earlier that if
4  Fred Loya owed the money it would pay it?
5    A.  Yes.
6    Q.  Correct?
7    A.  Yes.
8    Q.  Okay.  And if Fred Loya owed the money for punitive
9  damages, it would have paid it, correct?
10        MR. GROSSMAN:  Objection, form.
11    A.  Yes.
12    Q.  (BY MR. ZAMORA)  Okay.  And Fred Loya's denied and
13  answered to number -- or request for admission Number 11 that
14  punitive damages are warranted, correct?
15    A.  Yes.
16    Q.  And would you agree that there is a clear distinction
17  between compensatory and punitive damages?
18    A.  Yes.
19    Q.  And you agree that compensatory damages are meant for
20  the loss suffered?
21        MR. GROSSMAN:  Objection, form.
22    A.  Yes.
23    Q.  (BY MR. ZAMORA)  Okay.  And in this case, that would
24  be Mr. Swiech's property damage?
25    A.  Yes.

Page 48

1    Q.  Okay.  And you agree that punitive damages are
2  different from compensatory to the extent that punitive damages
3  require more, correct?
4        MR. GROSSMAN:  Objection, form.
5    A.  Yes.
6    Q.  (BY MR. ZAMORA)  Okay.  You understand that because
7  it requires a showing of malicious, willful, reckless, or
8  wanting conduct?
9    A.  Yes.
10    Q.  Okay.  And you also agree that punitive damages are
11  awarded for the limited purpose of punishment and to -- to
12  deter others from, like, offenses?
13    A.  Yes.
14    Q.  All right.  That means that the punitive damages are
15  not compensation for a loss but to punish and deter conduct,
16  correct?
17        MR. GROSSMAN:  Objection, form.  Go ahead.
18    A.  Yes.
19    Q.  (BY MR. ZAMORA)  And you're aware that if punitive
20  damages are awarded in this case, Fred Loya is not entitled to
21  any credit because it did not pay Mr. Swiech for punitive
22  damages; is that right?
23        MR. GROSSMAN:  Objection, form.
24    A.  Repeat, please.
25    Q.  (BY MR. ZAMORA)  Would you agree that if punitive

Page 49

1  damages are awarded in this case, Fred Loya is not entitled to
2  a credit because it did not pay for punitive damages?
3        MR. GROSSMAN:  Objection, form.
4    A.  Yes.
5    Q.  (BY MR. ZAMORA)  And you -- you said that you have
6  not reviewed the deposition of Officer Bernard, who
7  investigated the facts in this case; is that right?
8    A.  That's right.
9    Q.  Okay.  And you still deny that punitive damages are
10  warranted?
11    A.  Yes.
12    Q.  Okay.  But based on your understanding, this is a
13  individual who was fleeing from police officers at a high rate
14  of speed through an apartment complex?
15    A.  That's what the police report reflected.
16    Q.  Okay.  And there is no reason to not believe the
17  police in this -- in this case, is there?
18    A.  No.
19    Q.  Okay.  So you denied that punitive damages are
20  warranted, do you condone Brandon Sandoval's conduct?
21        MR. GROSSMAN:  Objection, form.  Argumentative.
22  Go ahead.
23    A.  I am not going to form an opinion on Brandon
24  Sandoval's behavior.  I -- you know, I read the police report
25  and what it -- you know, what it said was that he was leaving

13 (Pages 46 to 49)

Tel: (210) 490-6444                          Fax: (210) 579-6507

Electronically signed by Carissa Crocker (501-366-571-6219)
Electronically signed by Carissa Crocker (501-366-571-6219)

99f86d0e-0f63-42b1-b1f1-f2ec20c918af

Page 50

```
1   the apartment complex.  I don't -- you know, I am not going to
2   speculate as to what else he was doing or whatever behavior he
3   was engaged in.  I see what the police report says, but I don't
4   -- I don't know that to absolute fact.
5       Q.  Okay.  Well, let's not even talk about Brandon
6   Sandoval.
7           Do you condone people fleeing from police
8   officers at a high rate of speed?
9           MR. GROSSMAN:  Objection, form.
10      A.  No.
11      Q.  (BY MR. ZAMORA)  Okay.  Do you believe that that type
12  of conduct is safe?
13      A.  No.
14      Q.  Do you believe that that type of conduct is
15  justified?
16          MR. GROSSMAN:  Objection, form.
17      A.  No.
18      Q.  (BY MR. ZAMORA)  All right.  Do you believe that all
19  of us are free to -- to flee from police at a high rate of
20  speed?
21          MR. GROSSMAN:  Objection, form.
22      A   Do I believe that all of use are free to --
23      Q.  (BY MR. ZAMORA)  To flee from police officers?
24      A.  I believe anyone can make the decision that they
25  make, but do I think it's right to flee from the police, no.
```

Page 51

```
1       Q.  Okay.  Is that because that type of conduct is
2   dangerous?
3           MR. GROSSMAN:  Objection, form.
4       A   It can be, yes.
5       Q   (BY MR. ZAMORA)  And that means that harm may result
6   from that type of conduct?
7       A.  It may.
8       Q.  And do you believe that Brandon Sandoval was
9   intentionally trying to flee from police?
10      A.  Based on the police report, it appears that he was
11  intentionally trying to leave the apartment complex --
12      Q.  Okay.
13      A.  -- with the police there --
14      Q.  Because that --
15      A.  -- so yes.
16      Q.  -- from the police report he fled on foot from the
17  police officer?
18      A.  Yes.
19      Q.  Okay.  And then he got into the car and tried to get
20  out of the apartment complex at a high rate of speed?
21      A.  The police report indicated he was -- he was driving
22  in the parking lot at approximately 50 miles an hour.
23      Q.  Okay.  And even though he wrecked into Mr. Swiech's
24  vehicle and was ultimately apprehended, are you aware that he
25  pulled a knife on the police officers?
```

Page 52

```
1           MR. GROSSMAN:  Objection, form.
2       A.  I -- I read that there was a knife under the vehicle.
3   I did not read that he attempted to pull a knife on anyone.
4       Q.  (BY MR. ZAMORA)  All right.  And are you aware that
5   from the police report, he was -- again, even though he was
6   arrested and taken to the police station, he some how got out
7   and attempted to flee?
8       A.  Yes, I read that.
9       Q.  Okay.  Do you believe that Brandon Sandoval's conduct
10  was done with utter indifferences -- utter indifference to the
11  consequences?
12          MR. GROSSMAN:  Objection, form.
13      A.  I don't know whether or not Brandon Sandoval had any
14  utter indifferences to the consequences.  His actions were his
15  actions.  I am not going to speculate as to how he felt about
16  that.
17      Q.  (BY MR. ZAMORA)  All right.  Without speculating to
18  how he felt about it, in your opinion, is that type of conduct
19  done with utter indifference to the consequences?
20          MR. GROSSMAN:  Objection, form.  And asked and
21  answered.
22      A.  It would seem to be that way, yes.
23      Q.  (BY MR. ZAMORA)  Okay.  And that type of conduct
24  creates a high risk of danger?
25          MR. GROSSMAN:  Objection, form.
```

Page 53

```
1       A.  It can.
2       Q.  (BY MR. ZAMORA)  And do you think that type of
3   conduct is done with the indifference of the rights of the
4   residents in the apartment complex?
5           MR. GROSSMAN:  Objection, form.
6       A.  Perhaps, yes.
7       Q.  (BY MR. ZAMORA)  Okay.  And that includes Mr. Swiech
8   being a resident of the apartment complex?
9       A.  That would include Mr. Swiech being a resident of the
10  apartment complex.
11      Q.  Based on the information that you have, do you agree
12  that Brandon Sandoval exhibited a conscious disregard for the
13  rights of the residents in the apartment complex?
14          MR. GROSSMAN:  Objection, form.
15      A.  It would appear so, yes.
16      Q.  (BY MR. ZAMORA)  Okay.  And again, same thing, that
17  includes Mr. Swiech being a resident of the apartment complex?
18          MR. GROSSMAN:  Objection, form.
19      A.  That includes Mr. Swiech, yes.
20      Q.  (BY MR. ZAMORA)  After going through that, do you
21  agree that Brandon Sandoval's conduct warrants punitive
22  damages?
23          MR. GROSSMAN:  Objection, form.  Asked and
24  answered.
25      A.  Do I agree -- can you repeat the question?
```

14 (Pages 50 to 53)

Page 54

1     Q. (BY MR. ZAMORA) Yeah. After we have talked about
2 all of this, do you agree that Brandon Sandoval's conduct
3 warrants punitive damages?
4     MR. GROSSMAN: Objection, form. Asked and
5 answered.
6     MR. ZAMORA: And, again, Mr. Grossman, I am
7 going to ask that you leave them to form and foundation, but
8 you can answer.
9     A. It could, yes.
10     Q. (BY MR. ZAMORA) It could, or it does?
11     MR. GROSSMAN: Objection, form.
12     A. It could.
13     Q. (BY MR. ZAMORA) You won't admit that Brandon
14 Sandoval's conduct warrants punitive damages?
15     A. No.
16     Q. (BY MR. ZAMORA) Okay. So you don't think that type
17 of behavior should be punished?
18     MR. GROSSMAN: Objection. We have now asked
19 that question more than --
20     MR. ZAMORA: Mr. Grossman, I am going to ask you
21 to leave your objections to form and foundation.
22     MR. GROSSMAN: Mr. Zamora, I am going to ask you
23 to quit asking the same question over and over again. We are
24 going to be here all day.
25     MR. ZAMORA: No, I am going --

Page 56

1 information. Not without a court --
2     MR. ZAMORA: Are you going -- are you going to
3 tell her not to answer that?
4     MR. GROSSMAN: Unless the court orders her to do
5 it.
6     MR. ZAMORA: Okay.
7     MR. GROSSMAN: I don't think your entitled to
8 the reserves on this case.
9     MR. ZAMORA: And I will go ahead and reserve
10 that issue, but with that being said, I'll pass the witness.
11     MR. GROSSMAN: Reserve our questions until time
12 of trial.
13     MR. ZAMORA: Okay. I take it you're going to
14 read and sign.
15     MR. GROSSMAN: Yes.
16     MR. ZAMORA: Okay. We will -- so that's it and
17 I appreciate your time, Ms. Sealey.
18     THE WITNESS: No problem, thank you.
19     MR. ZAMORA: Thank you.
20     (End of proceedings at 4:25 p.m.)
21
22
23
24
25

Page 55

1     MR. GROSSMAN: We can go back on the record and
2 look.
3     MR. ZAMORA: I am almost done --
4     MR. GROSSMAN: Okay.
5     MR. ZAMORA: -- actually, I am almost done. I
6 just have a few more questions.
7     MR. GROSSMAN: All right. Go ahead.
8     Q. (BY MR. ZAMORA) All I want to know is, do you think
9 that Brandon Sandoval's behavior should be punished?
10     MR. GROSSMAN: Objection, form. Go ahead.
11     A. Yes.
12     Q. (BY MR. ZAMORA) All right. How about deterred?
13     A. Yes.
14     Q. Do you know if Fred Loya has ever paid punitive
15 damages because somebody fled from police officers?
16     A. It has.
17     Q. Final question: Prior to filing this lawsuit, what
18 were the reserves set in this case?
19     MR. GROSSMAN: Objection, form, and that's --
20 that's going into information that's privileged.
21     MR. ZAMORA: I am not asking any information
22 that's privileged. All I am asking for is the reserves prior
23 to this lawsuit, prior to any attorneys being involved in this
24 case.
25     MR. GROSSMAN: You are not entitled to that

Page 57

CHANGES AND SIGNATURE
WITNESS NAME: ADRIANE SEALEY   DATE: AUGUST 27, 2015
PAGE LINE     CHANGE        REASON

16 (Pages 54 to 57)

Tel: (210) 490-6444                       Fax: (210) 673-6507

Electronically signed by Carissa Crocker (501-366-571-6219)
Electronically signed by Carissa Crocker (501-366-571-6219)

99f86d0e-0f63-42b1-b1f1-f2ec20c918af

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

FRED LOYA INSURANCE COMPANY
          Plaintiff/Counter-Defendant,

v.                             Cause No. D-202-CV-2014-00582

THOMAS J. SWIECH,
          Defendant/Counter-Plaintiff.

## PLAINTIFF/COUNTER-DEFENDANT'S RESPONSES TO
## DEFENDANT/COUNTER-PLAINTIFF'S SECOND REQUEST FOR ADMISSION

TO:    Thomas J. Swiech
       c/o Richard J. Valle
       C. D. Carter III
       8012 Pennsylvania Circle, NE
       Albuquerque, NM 87110

     COMES NOW the Plaintiff/Counter-Defendant, FRED LOYA INSURANCE

COMPANY, by and through its attorneys, CRAIG, TERRILL, HALE & GRANTHAM and

hereby provides his responses to Second Request for Admission as follows:

                    CRAIG, TERRILL, HALE & GRANTHAM, L.L.P.
                    9816 Slide Road, Suite 201
                    Lubbock, Texas 79424
                    (806) 744-3232
                    (806) 744-2211 (fax)

                    _Elizabeth G. Hill_
                    Andrew B. Curtis – NM121385
                    Elizabeth G. Hill - NM 145315
                    ATTORNEYS FOR DEFENDANT

EXHIBIT
3

From:CTH&G                    1 806 744 2211          07/06  015 14:06      #040 P.003/006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent by Certified Mail, to the following person on this the *16th* day of *July*, 2015:

*Elizabeth B Hill*
*Of the Firm*

Richard J. Valle
C. D. Carter III
8012 Pennsylvania Circle, NE
Albuquerque, NM 87110

From:CTH&G                    1 806 744 2211            07/06  '15 14:07   #040 P.005/006

9.     Please admit that leading police officers on a high speed chase through a residential

parking lot is conduct that should be punished.

Defendant objects to the improper form of this request which calls for an ultimate
conclusion, mental impression and opinion, prohibited under the rules.  *See* NMSA 1-026
(5) ("[T]he court shall protect against disclosure of the mental impressions, conclusions,
opinions or legal theories of an attorney or other representative of a party concerning the
litigation."). Defendant is not acquainted with Mr. Sandoval, and has no personal
knowledge of his thought processes. Therefore, to the extent that a response is required,
denied.


10.     Please admit that leading police officers on a high speed chase through a residential

parking lot is conduct that should be deterred.

Defendant objects to the improper form of this request which calls for an ultimate
conclusion, mental impression and opinion, prohibited under the rules.  *See* NMSA 1-026
(5) ("[T]he court shall protect against disclosure of the mental impressions, conclusions,
opinions or legal theories of an attorney or other representative of a party concerning the
litigation."). Defendant is not acquainted with Mr. Sandoval, and has no personal
knowledge of his thought processes. Therefore, to the extent that a response is required,
denied.

11.     Please admit that Brandon Sandoval's conduct leading up to and at the time of the subject

crash warrants punitive damages.

Defendant objects to the improper form of this request which calls for an ultimate
conclusion, mental impression and opinion, prohibited under the rules.  *See* NMSA 1-026
(5) ("[T]he court shall protect against disclosure of the mental impressions, conclusions,
opinions or legal theories of an attorney or other representative of a party concerning the
litigation."). Defendant is not acquainted with Mr. Sandoval, and has no personal
knowledge of his thought processes. Therefore, to the extent that a response is required,
denied.


12.     Please admit that Brandon Sandoval was charged with twenty-three crimes in case

number D-202-CR-201303216 for his conduct on June 21, 2013.

Admitted.



7684.0378

13.   Please admit that Brandon Sandoval had objects linked to illicit drugs in his vehicle at the

time of the subject crash.

To the extent that this Defendant can respond to this request, admitted. Defendant has no personal knowledge concerning this request and relies on the records and documents concerning the incident.

14.   Please admit that Brandon Sandoval's conduct prior to and at the time of the crash was

below the standard of care.

Defendant objects to the improper form of this request which calls for an ultimate conclusion, mental impression and opinion, prohibited under the rules. *See* NMSA 1-026 (5) ("[T]he court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation."). "Standard of care" is undefined. Defendant is not acquainted with Mr. Sandoval, and has no personal knowledge of his thought processes. Therefore, to the extent that a response is required, denied.

15.   Please admit that Fred Loya Insurance Company paid Mr. Swiech an undisputed amount

of $6,433.76 for punitive damages.

Defendant denies that this amount was undisputed and denies that this amount has been deemed "punitive damages." Defendant admits that a total of $10,000 has been paid to Mr. Swiech.

16.   Please admit that Mr. Swiech incurred at least $3,566.24 in property damage as a result of

the subject crash.

Admitted as to Mr. Swiech incurred $3,566.24 in property damage.